**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO.: 1:17-cv-20063-FAM**

**NABOR DIEGO,**
And other similarly situated individuals,

    Plaintiff(s),

v.

**VICTORY LAB, INC.,**
a Florida Profit Corporation

    Defendant(s).
_____/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, NABOR DIEGO ("Plaintiff"), pursuant to Fed. R. Civ. P. 56 and the Local Rules of the United States District Court for the Southern District of Florida, hereby opposes the Motion for Summary Judgment filed by Defendant, VICTORY LAB, INC. ("Defendants"), and in support states as follows:

**MEMORANDUM OF LAW**

**I.    APPLICABLE LEGAL STANDARDS**

    **A.    Standards For Summary Judgment**

In review of a motion for summary judgment, the Court is guided by Federal Rule of Civil Procedure 56(a). The moving party bears the burden of meeting this exacting standard. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). That is, "[t]he moving party bears 'the initial responsibility of informing the...court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue

of material fact.'" *U.S. vs. Four Parcels of Real Prop.,* 941 F.2d 1428, 1437 (11th Cir. 1991) (*quoting Celotex,* 477 U.S. at 323). In assessing whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising therefrom in the light most favorable to the non-moving party. *Batey v. Stone,* 24 F.3d 1330, 1333 (11th Cir. 1994).

"[T]he court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied." *Carlin Commc'n, Inc. v. Southern Bell Tel. & Tel. Co.,* 802 F.2d 1352, 1356 (11th Cir. 1986); *see also Aurich v. Sanchez,* 2011 WL 5838233, at *1 (S.D. Fla. Nov. 21, 2011) ("If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then the court must not grant summary judgment." (citing *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913 (11th Cir. 1993)). In particular, summary judgment is **inappropriate** where the Court would be required to weigh conflicting renditions of material fact or determine witness credibility. *See Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 919 (11th Cir. 1993) (noting a court must not weigh conflicting evidence nor make credibility determinations when ruling on a motion for summary judgment); *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."); *Gary v. Modena,* 2006 WL 3741364, at *16 (11th Cir. Dec. 21, 2006) (Rule 56 precludes summary judgment where court would be required to reconcile conflicting testimony or assess witness credibility); *Ramirez v. Nicholas,* 2013 WL 5596114, at *4 (S.D. Fla. Oct. 11, 2013) ("The Court may not make the credibility determinations needed to resolve this conflict; only the jury may do so.").

### B. The FLSA Generally

Generally, the Fair Labor Standards Act requires employers to compensate their employees who work in excess of forty hours per week at a rate of one and one-half times the regular rate at which they are employed. *See* 29 U.S.C. § 207(a); *Garcia v. Port Royale Trading Co.*, 198 Fed. Appx. 845 (11th Cir. 2006) (citing *Davis v. Friendly Express, Inc.*, 2003 U.S. Dist. LEXIS 24499, 2003 WL 21488682, *1 (11th Cir. 2003)). The regular hourly rate is the rate actually paid for the normal non-overtime work week. *Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37 (1944).

As the court recognized in *Herman v. City of St. Petersburg*, 131 F. Supp. 2d 1329, 1334 (M.D. Fla. 2001):

> The overtime provisions of the FLSA serve two purposes. *See Donovan v. Brown Equip. & Serv. Tools, Inc.*, 666 F.2d 148, 151 (5th Cir. 1982). The first purpose is to spread employment by placing financial pressure on the employer to hire additional workers rather than to continually employ the same number of worker for longer hours. *See id*. The second purpose is to compensate employees who do work "over-time" for the burden of having to do so. *See id*.; *see also Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37, 40, 89 L. Ed. 29, 65 S. Ct. 11 (1944);*Walling v. Youngerman-Reynolds Hardwood Co*., 325 U.S. 419, 423-24, 89 L. Ed. 1705, 65 S. Ct. 1242 (1945). Therefore, the FLSA forbids pay plans that have the effect of reducing the pay for overtime to less than one and one-half times the employees "regular rate" even though the plans may be acceptable to the employees involved. *See id.*

As the court explained,

> In computing overtime, the FLSA requires that the overtime rate be not less than one and one-half the "bonafide rate established for like work performed during non-overtime hours." 29 C.F.R. § 778.308(b). Additionally, the FLSA provides that, although the parties can agree to different base rates for different types of work, once a rate has been agreed upon for a particular type of work, the parties cannot lawfully agree the rate will be lower simply because the work is performed during statutory overtime hours, or in a week where statutory overtime is performed. *See* 29 C.F.R. § 778.316.

131 F. Supp. at 1332. "Employers who violate these provisions of the FLSA are 'liable to the employee or employees affected in the amount of their … unpaid overtime compensation … and in an additional equal amount as liquidated damages." *Prickett v. Dekalb County*, 349 F.3d 1294, 1296 (11th. Cir. 2003) (quoting 29 U.S.C. §§ 216(b)).

The statute of limitations is two years for non-willful violations (counting backwards from when the action is filed, or a written consent to opt in is filed), or three years for willful violations. 29 U.S.C. §§ 255-256(b). The FLSA "must be interpreted broadly to effectuate its humanitarian and remedial purpose." *Antenor v. D & S Farms*, 88 F.3d 925, 933 (11th Cir. 1996) (internal citations and quotations omitted).

## II.     ARGUMENT

### A.     Genuine Issues Of Material Fact Exist As To Whether Plaintiff is an Employee of Defendant

The FLSA broadly defines "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). The term "employ" is defined with similar breadth as "to suffer or permit to work." *Id.* § 203(g). Therefore, to give effect to the FLSA's remedial purposes, courts have adopted an expansive definition of "employee." *Usery v. Pilgrim Equip. Co.,* 527 F.2d 1308, 1311 (5th Cir. 1976).

Importantly, this and other Courts have held time and time again that whether a person is an employee or an independent contractor is a question of fact for the jury. *Garcia v. Copenhaver, Bell & Associates, M.D.'s, P.A.*, 104 F.3d 1256, 1266 (11th Cir. 1997); *see also Sagarino v. Marriott Corp.*, 644 So. 2d 162, 164 (Fla. Dist. Ct. App. 1994) ("The question of whether there exists an employer/employee relationship is normally reserved for the jury"); *Carroll v. Kencher, Inc.*, 491 So. 2d 1311, 1313 (Fla. Dist. Ct. App. 1986) ("When there are varying inferences and conclusions which can be drawn from the facts . . . the issue of whether

an individual is an employee or an independent contractor should be submitted to the jury"); *Pearson v. Harris*, 449 So. 2d 339, 342 (Fla. Dist. Ct. App. 1984) (the existence of an employer-employee relationship is normally one for the jury to decide); *Saudi Arabian Airlines Corp. v. Dunn*, 438 So. 2d 116, 119 (Fla. Dist. Ct. App. 1983) (recognizing the existence of an employer-employee relationship is normally one for the jury to decide); U.S. Eleventh Circuit Pattern Jury Instructions (Civil Cases) § 1.10.4.1, Comment (West 2005) (whether a person is an employee or independent contractor is a question of fact for the jury). *See also Carlson et al. v. Fed Ex Ground Package Systems, Inc.,* Case No. 13-14979 (11th Cir. 2015).

Moreover, Defendant's subjective beliefs and expectations, as well as the labels they place on their relationship, are immaterial. *See Scantland v. Jeffry Knight, Inc.,* 721 F.3d 1308, 1313 (11th Cir. 2013) (citing *Bartels v. Birmingham,* 332 U.S. 126, 1430 (1947)); *Chapman v. A.S.U.I. Healthcare and Development Center,* ___ Fed. App'x ___, 2014 WL 351868, at *1 (5th Cir. 2014) ("Neither a defendant's subjective belief about employment status nor the existence of a contract designating that status is dispositive").

The FLSA defines an "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). In turn, the FLSA defines "to employ" as "to suffer or permit to work," 29 U.S.C. § 203(g), and an "employer" as "any person acting . . . in the interest of an employer in relation to an employee," 29 U.S.C. § 203(d). "In order to determine whether an alleged employer `suffer[s] or permit[s]' an individual to work, [the Court] ask[s] `if, as a matter of economic reality, the individual is dependent on the entity.'" *Layton v. DHL Express (USA), Inc.,* No. 11-12532, 2012 WL 2687961, at *3 (11th Cir. July 9, 2012) (quoting *Antenor v. D & S Farms,* 88 F.3d 925, 929 (11th Cir. 1996)); *see also Freund v. Hi-Tech Satellite, Inc.,* 185 F.

App'x 782, 782-83 (11th Cir. 2006) (quoting *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 728 (1947)).

This "economic realities test" therefore looks at the "surrounding circumstances of the whole activity" to ascertain whether the person was dependent upon the putative employer. *Beck v. Boce Grp., L.C.,* 391 F. Supp. 2d 1183, 1186 (S.D. Fla. 2005).  *See also Harrell v. Diamond A Entm't, Inc.*, 992 F. Supp. 1343 (S.D. Fla. 1997). For purposes of determining economic dependency, the issue of control is only significant when it shows that an individual exerts such control over "a meaningful part" of their business that they stand as "a separate economic entity." *Usery v. Pilgrim Equip. Co.,* 527 F.2d 1308, 1312–13 (5th Cir.1976).  Courts have outlined several factors to be considered in the economic-reality inquiry. These factors include the following:

> (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; .
>
> (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
>
> (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
>
> (4) whether the service rendered requires a special skill;
>
> (5) the degree of permanency and duration of the working relationship;
>
> (6) the extent to which the service rendered is an integral part of the alleged employer's business.

*Freund,* 185 F. App'x at 783 (quoting *Sec'y of Labor v. Lauritzen,* 835 F.2d 1529, 1535 (7th Cir. 1987)); *see Layton,* 2012 WL 2687961, at *6 (noting that "the factors are used because they are indicators of economic dependence"); *see also Velez v. Sanchez,* No. 11-90-cv, 2012 WL 3089376, at *13 (2d Cir. July 31, 2012) ("[T]he `ultimate concern' in distinguishing independent contractors and employees is whether the workers `depend upon someone else's business for the

opportunity to render service or are in business for themselves[.]'" (quoting *Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1059 (2d Cir. 1988))).

While these factors are useful in guiding a court's analysis, no single factor outlined above is dispositive of the touchstone issue in the economic-reality inquiry: whether the alleged employee is economically dependent on the alleged employer or whether, instead, the alleged employee is in business for him or herself. *Freund,* 185 F. App'x at 783; *Molina v. S. Fla. Express Bankserv, Inc.,* 420 F. Supp. 2d 1276, 1284 (M.D. Fla. 2006); *Santelices v. Cable Wiring,* 147 F. Supp. 2d 1313, 1318-19 (S.D. Fla. 2001).

The Eleventh Circuit has furthermore explained that "a worker who performs a routine task that is a normal and integral phase of the [alleged employer]'s production is likely to be dependent on the [alleged employer]'s overall production process." *Antenor,* 88 F.3d at 937. Again, **economic dependence is the ultimate notion** that must direct the court's decision and "the weight of each factor depends on the light it sheds on the []workers' economic dependence (or lack thereof) on the alleged employer, which in turn depends on the facts of the case." *Id*. at 932-33. "An employer cannot saddle a worker with the status of independent contractor, thereby relieving itself of its duties under the FLSA, by granting him some legal powers where the economic reality is that the worker is not and never has been independently in the business which the employer would have him operate." *Mednick v. Albert Enters., Inc.,* 508 F.2d 297, 303 (5th Cir.1975). For example, in *Olson v. Star Lift Inc*., 709 F. Supp. 2d 1351 (S.D. Fla. 2010), the district court in a non-jury trial found that a plaintiff was an employee even where he had to buy his own tools; he performed much work unsupervised; he could be paid for more "hours" in a day if he worked faster; and his income was reported on a 1099 form.

      i. Defendant Controlled The Manner In Which Plaintiff's Work Was To Be Performed

When an alleged employer provides "specific direction for how workers, particularly low-skilled workers, are to perform their jobs, courts have weighed the control factor in favor of employee status." *Montoya v. S.C.C.P. Painting Contractors, Inc.,* 589 F. Supp. 2d 569, 579 (D. Md. 2008) (finding factors such as the provision of supervision of painters, instruction in what paint to use and how many coats to apply, and on-the-job training to be indicative of employee status). Similarly, the provision of written instructions and procedures for how to complete the job also indicates employee status. *See Schultz v. Capital Int'l Sec., Inc.,* 466 F.3d 298, 307 (4th Cir. 2006) (finding an eight-page standard operating procedure document outlining job tasks indicative of employee status); *Solis v. Int'l Detective & Protective Serv., Ltd.,* 819 F. Supp. 2d 740, 750 (N.D. Ill. 2011) (finding a policy and procedure handout coupled with close monitoring of workers' compliance with the procedures indicative of control). The provision of training likewise indicates an employee-employer relationship. *See Gate Guard Servs. L.P. v. Solis,* 2013 WL 593418, at *4 (S.D. Tex. Feb. 13, 2013) (noting the significance of training and observing that the non-provision of training indicates an independent-contractor relationship). Finally, supervision need not be constant to establish an employee-employer relationship. *See Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1060 (2d Cir. 1988) (citing *Donovan v. Dial America Mktg., Inc.,* 757 F.2d 1376, 1383-84 (3d Cir. 1985)) ("An employer does not need to look over his workers' shoulders every day in order to exercise control.").

Defendant employed a regional manager to oversee canvassers, train them, provide technical assistance, and give them materials used in the work they performed for Defendant. Pla. SMF ¶ 19. On his first day with Defendant, Plaintiff was given training by a supervisor so that he would know how to perform his duties as a canvasser. Pla. SMF ¶ 4. Defendant also

required canvassers to agree to various policies including that they should not share their rate of compensation with voters or other employees, and that even a first-time violation could result in being added to a "do not hire" list. Pla. SMF ¶ 20. As well, canvassers were required to agree to various terms of confidentiality with respect to their work for Defendant, including that such obligations would extend even after their employment was terminated. Pla. SMF ¶ 21. Additionally, canvassers were subject to restrictive covenants such as being prohibiting from working with other companies similar to Defendant and from soliciting Defendant's employees or accounts. Pla. SMF ¶ 37. Canvassers were also prohibited from working for Defendant's clients or contracting agents for a period of two years after employment was terminated. Pla. SMF ¶ 37.

Defendant gave canvassers a specified time to meet each morning with their regional manager to pick materials and start working. Pla. SMF ¶ 29. The regional manager would arrange to meet the canvasser at a set location which was adjacent to the canvassing area for that day. Pla. SMF ¶ 29. Defendant then used a GPS tracking system to monitor the hours and work performed by the canvassers it hires. Pla. SMF ¶ 30. Defendant requires its canvassers to have either an iPhone with the iOS operating system or a smart phone with the Android operating system to download a software application called Campaign Sidekick which records the time, date, and location of each interaction made by the canvassers. Pla. SMF ¶ 31-32.

Finally, Defendant requires canvassers to adhere to a specific dress code. Pla. SMF ¶ 35. The dress code was detailed and specific, and included provisions regarding the necessary type of shoes, pants, hats, and shirts that could be worn; rules about facial hair and hygiene; and the requirement to wear a name badge and campaign t-shirt or sticker, if available. Pla. SMF ¶ 35.

> ii. Plaintiff Did Not Have An Opportunity For Profit Or Loss

The opportunity for profit or loss must extend beyond the mere threat of lost wages and must involve the risk of losing a capital investment. *See Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1536 (7th Cir. 1987); *Clincy v. Galardi S. Enters., Inc.*, 808 F. Supp. 2d 1326, 1345-46 (N.D. Ga. 2011). Canvassers made no capital investments in Defendant's business, nor did they have any say in their rate of pay which was determined by Defendant. Pla. SMF ¶ 5.

Moreover, while Defendant was paid based on the number of doors canvassers knocked on, the canvassers themselves could not earn more by knocking on more doors; they were paid the same hourly rate regardless of how efficiently they performed their work. Pla. SMF ¶ 3. Accordingly, there was no opportunity for profit or loss to the extent that Plaintiff could not "accept more jobs, perform more efficiently, or hire other employees." *See Freund*, at 783; *see also Reich v. Circle C. Invs., Inc.,* 998 F.2d 324, 328 (5th Cir. 1993) (finding that an alleged employer's "control over determinants of customer volume" constrains an individual's opportunity for profit); *Lauritzen,* 835 F.2d at 1536 (Beyond the occasional purchase of negligible cleaning supplies and tools, which is insufficient to present a risk of loss, Plaintiffs invested practically nothing but their labor in their cleaning work.).

> iii. Defendant Provided Equipment And Materials Required For Plaintiff's Work

Canvassers were given handout materials to deliver to the households they were required to visit. Pla. SMF ¶ 22. The handout materials provided by Defendant to canvassers included door hangers and flyers. Pla. SMF ¶ 23. Defendant also provided canvassers with registration forms and name badges for their work. Pla. SMF ¶ 24. Some regional managers, including Graciela Montenegro, additionally offered notepads, pens, and paper for canvassers to us. Pla. SMF ¶ 25. Typically only large out-of-pocket investments suggest independent contractor status

while the purchase of only negligible items or labor itself—as here—points to the opposite conclusion. *See Lauritzen*, 835 F.2d at 1537; *Jaworski v. Master Hand Contractors, Inc.*, 2013 WL 1283534, at *4 (N.D. Ill. Mar. 27, 2013).

Plaintiff did use his own vehicle at times to drive around other canvassers; yet, while an investment in a vehicle for transportation is a substantial one, this factor is diluted when the vehicle is one used largely for personal purposes rather than primarily for business purposes. *See Molina v. S. Fla. Express Bankserv, Inc.,* 420 F. Supp. 2d 1276, 1285 (M.D. Fla. 2006) (citing *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 304 (5th Cir. 1998)).

Furthermore, Defendant even gave its regional managers an operating budget which included payroll and a separate budget to buy miscellaneous or supplementary items. Pla. SMF ¶ 26. The miscellaneous budget was about $200 per month and was used to buy materials that canvassers needed to do their work, such as name tags and water. Pla. SMF ¶ 27.

### iv. Plaintiff's Work Required No Special Skill

Defendants readily admit that there are no special skills, training, or experience required to be a canvasser. Pla. SMF ¶ 36.

### v. Permanency and Duration of the Working Relationship

Here, Plaintiff acknowledges that the nature of Defendant's business model makes it somewhat impermanent. That being said, when Defendant hired Plaintiff, no one told him that the job would end after Election Day. Pla. SMF ¶ 2. Defendant's job application for canvassers suggests that candidates are applying for current "and future projects." Pla. SMF ¶ 2. Indeed, though Defendant's contracts typically revolve around election cycles, it does operate its business—and specifically pursues contracts requiring canvasser services—year-round. Pla. SMF ¶ 38.

Finally, Plaintiff clearly relied on the work and income derived from his employment with Defendant who admits that, after Plaintiff was let go the first time, Plaintiff and his wife texted his supervisor "incessantly…because they had a family with small children and needed the money." Pla. SMF ¶ 15. Similarly, Plaintiff testified that he did not have any other employers while working for Defendant, except for, occasionally, late at night, he might drive for Uber. Pla. SMF ¶ 11. Plaintiff testified further that, while working for Defendant, he did not have time to work any other jobs. Pla. SMF ¶ 11.

## vi. Plaintiff's Work Was An Integral Part Of Defendant's Business

The Eleventh Circuit has explained that "a worker who performs a routine task that is a normal and integral phase of the [alleged employer]'s production is likely to be dependent on the [alleged employer]'s overall production process." *Antenor,* 88 F.3d at 937. Here, there can be little doubt that canvassers performed routine tasks that were normal and integral to Defendant's business operations. Pla. SMF ¶ 3. Indeed, the more integral the service, the more likely the worker is an employee. *Scantland v. Jeffry Knight, Inc.,* 721 F.3d 1308,1319 (11th Cir. 2013) (noting where service provided by workers is admittedly the "backbone" of a business, the employer is unlikely to relinquish sufficient control over business for workers to truly act as independent contractors); *Scruggs v. Skylink, Ltd.,* 2011 WL 6026152, at *8 (S.D. W.Va. Dec. 2, 2011).

**B.     Genuine Issues Of Material Fact Exist As To Whether Plaintiff Engaged in Protected Activity and Was Terminated in Retaliation**

Florida Statute section 448.101 *et seq*. is Florida's private sector Whistleblower's Act. The relevant section to this case provides as follows:

> An employer may not take any retaliatory personnel action against an employee because the employee has:
> ...

>> (3) Objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation.

Fla. Stat. § 448.102. The Florida Supreme Court has stated that the purpose of the FWA is "to protect private employees who report or refuse to assist employers who violate laws enacted to protect the public." *Arrow Air, Inc. v. Walsh*, 645 So. 2d 422, 424 (Fla. 1994). In order to raise a successful claim of retaliatory discharge under the FWA, a claimant must show that: (1) he engaged in statutorily protected expression, (2) he suffered a materially adverse action of a type that would dissuade a reasonable employee from engaging in statutorily protected activity, and (3) there was some causal relation between the events. *See Rutledge v. SunTrust Bank,* 262 Fed.Appx. 956, 958-59 (11th Cir. 2008). As a statute that serves a remedial purpose, the FWA "should be construed liberally in favor of granting access to the remedy so as not to frustrate the legislative intent." *Rice-Lamar v. City of Fort Lauderdale,* 853 So. 2d 1125, 1132 (Fla. 4th DCA 2003).

Here, Defendant does not dispute the second prong, whether Plaintiff suffered an adverse employment action. Defendant, instead, argues that Plaintiff did not engage in protected activity, and that there was no causal connection between such activity and Plaintiff's termination.

Defendant first argues that Plaintiff did not engage in protected activity because never complained about undocumented workers <u>directly</u> to Defendant. Conveniently, however, Defendant has failed to identify any statutory or jurisprudential authority which supports such a narrow reading the FWA. Defendant cites to *Jenkins v. Golf Channel* for this proposition, but the cited portion explains only why written notice is <u>not</u> required under § 448.102(3). 714 So. 2d 558, 563 (Fla. 5th DCA 1998), *approved*, 752 So. 2d 561 (Fla. 2000) ("Under subsection 448.102(3), the employee has already objected or refused to participate in alleged illegal activities so written notice to the employer to cure would be superfluous."). Nothing in *Jenkins*

suggests that otherwise protected complaints or objections to illegal activity must be made directly to the employer.

Indeed, the principle advocated by Defendant has been rejected in the context of similar Florida statutes. For example, like under the FWA, Florida law also provides that "[n]o employer shall discharge, threaten to discharge, intimidate, or coerce any employee by reason of such employee's valid claim for compensation or attempt to claim compensation under the Workers' Compensation Law." Fla. Stat. § 440.205. Also like with FWA, a plaintiff suing under § 440.205 must show that he: (1) engaged in statutorily protected activity; (2) suffered an adverse employment action; and (3) the adverse action was causally related to the plaintiff's protected activity. *Humphrey v. Sears, Roebuck, and Co*., 192 F. Supp. 2d 1371, 1374 (S.D. Fla. 2002).

Importantly, Florida courts have found that statutory protection extends to subsequent employers, such that an employer cannot discriminate against an employee because of their prior workers' compensation claims against former employers. *Bruner v. GC-GW, Inc*., 880 So. 2d 1244, 1251 (Fla. 1st DCA 2004). Moreover, Florida courts routinely interpret § 440.205 in a manner consistent with its intent to prevent the chilling effect of filing workers' compensation claims. *Id.* at 1249 ("[e]xempting subsequent employers from the statute would allow them to defeat the Legislature's intent by firing or threatening to fire workers who had exercised their statutory rights."); *Smalbein v. Volusia County School Board,* 801 So.2d 169, 170 (Fla. 5th DCA 2001)(rejecting a statutory construction which would require the workers' compensation claims to be successful because "interpreting 'valid' as 'compensable' thwarts the purpose and intent of the Legislature to prohibit retaliation"); *Allan v. SWF Gulf Coast, Inc.,* 535 So.2d 638, 639 (Fla. 1st DCA 1988) (noting that specific retaliatory intent is not required by the express statutory language of section 440.205).

In other words, in the context of worker's compensation retaliation, protected expression is not limited to only those employees who file for benefits <u>directly</u> with their current employer. Indeed, if an employee has filed a petition for benefits against a prior employer, that employee is still protected from retaliation from any subsequent employer that may become <u>aware</u> of that activity. For the same reason, objections to the illegal activity of an employer need not be made directly to said employer; the FWA still protects an employee who articulates his objections to another employee or even a third-party. To that end, the crucial fact is whether an employer becomes <u>aware</u> of its employee's protected expression and then retaliates against that employee as a result. That is the scenario at bar, and the FWA protects Plaintiff regardless of whether he was employed by Defendant at the time he engaged in protected activity and regardless of whether those protected disclosures were made to a third-party.

Some time on or about within the last two weeks of August Plaintiff went to the office of Miguel De La Portilla—for whose campaign Defendant had been retained. Pla. SMF ¶ 14. Plaintiff spoke to an assistant in the office and informed her that Defendant was using undocumented workers as canvassers. Pla. SMF ¶ 14. Plaintiff knew this because one canvasser had asked him to cash her check for her because she had no documentation; Plaintiff refused. Pla. SMF ¶ 14. Plaintiff had a civil conversation with the assistant who informed him that the message would be passed on to the Senator; Plaintiff then left the office. Pla. SMF ¶ 14.

After Plaintiff went to the Senator's office to complain about the undocumented workers, Defendant found out and gave Plaintiff an appointment to meet with his supervisors. Pla. SMF ¶¶ 16-17. Plaintiff understood that the meeting would be with all of the canvassers, but it was for only him. Pla. SMF ¶¶ 16-17. Plaintiff arrived at the designated time but no one else was there. Pla. SMF ¶¶ 16-17. Montenegro and Rodriguez appeared. Pla. SMF ¶¶ 16-17. Plaintiff asked

where everyone was because he had been told it was a meeting for everyone. Pla. SMF ¶¶ 16-17. Montenegro told him that the meeting was just for him because they knew that Plaintiff had reported to the Senator's office that Defendant was hiring undocumented workers as canvassers. Pla. SMF ¶¶ 16-17. Rightfully fearing for his job, Plaintiff initially denied the allegations but it was clear Defendant already knew that he had reported the undocumented workers to the Senator's office. Pla. SMF ¶¶ 16-17. Montenegro then told Plaintiff that he was fired. Plaintiff protested saying that what Defendant was doing was illegal and that he had more right to work than the undocumented workers because he was a citizen. Pla. SMF ¶¶ 16-17. Plaintiff stated that he was going to continue to report Defendant's illegal activity. Pla. SMF ¶¶ 16-17.

Again, the crucial facts here are that Plaintiff objected to Defendant's hiring of undocumented workers. Though Defendant denies this allegation, it does not dispute that the hiring of undocumented workers generally constitutes illegal activity—the disclosure of which would otherwise be protected by the FWA. The remedial nature of the FWA advocates that there should be no distinction in Plaintiff articulating his objections directly to Defendant, or to one of its clients—who arguably has a substantial political interest in whether undocumented workers are being hired to work on his senatorial election campaign. The dispositive issue is that Defendant became <u>aware</u> that Plaintiff had lodged these objections to its illegal activity—and the fired him because of it.

In this regard, Defendant maintains that Montenegro—the regional manager who fired Plaintiff—was not aware that Plaintiff had complained about Defendant's undocumented workers to De La Portilla's office—though this seems unlikely. Defendant claims the Senator's office advised only that Plaintiff had caused a "scene." This, however, is a genuine issue of fact that must be resolved by a jury.

First, it seems unlikely that if the Senator's office received information that Defendant was hiring undocumented workers to canvass on the campaign, that it would not specifically convey that information. Even if the Senator's office did not believe what Plaintiff told them, it does not make sense that they would not disclose those specifics to Defendant, and instead state nothing more than that Plaintiff caused a "scene."

Secondly, Plaintiff specifically describes his interaction as a "civil" conversation with the assistant who informed him that the message would be passed on to the Senator. Pla. SMF ¶ 14. Furthermore, it is clear that Defendant convened the final meeting with Plaintiff with the intent to terminate him. Plaintiff testified that Montenegro told him that the meeting was just for him because they knew that Plaintiff had reported to the Senator's office that Defendant was hiring undocumented workers as canvassers. Pla. SMF ¶¶ 16-17.

Indeed, Defendant's only evidence that Montenegro did not specifically know about Plaintiff's complaints regarding undocumented workers is Montenegro's own self-serving affidavit. This "evidence" is, nevertheless, rebutted by Plaintiff's sworn deposition testimony and declaration. Such a narrow issue of knowledge and intent must indisputably be resolved by a jury to weigh the credibility of Plaintiff's and Montenegro's competing testimony—this issue cannot be resolved on summary judgment.

The extent of Montenegro's knowledge before she terminated Plaintiff is also at the heart of Defendant's causation arguments. Defendant admits that the decision to terminate Plaintiff had already been made prior to the final meeting with him. *See* ECF No. 18 p. 13 (stating that "at the termination meeting … the decision to terminate [Plaintiff's] contract had already been made."). Defendant claims that it was not aware of Plaintiff complaints regarding undocumented workers until at that meeting and, as such, that knowledge could not have motivated the decision

to terminate Plaintiff. As discussed above, however, Plaintiff has testified to the contrary—and it seems logical—that Montenegro possessed this knowledge prior to setting the "termination meeting." Moreover, if Montenegro did know that Plaintiff had complained about undocumented workers to the Senator's office, it is likely that such knowledge motivated the decision to terminate Plaintiff.

Montenegro stated in her declaration, "As a result of improperly contacting Senator de la Portilla's office and making a scene coupled with the complaints I received from other canvassers regarding Mr. Diego's behavior and his wife upsetting the other canvassers, I decided to terminate Mr. Diego's contract with Victory Lab Inc." ECF No. 19-3 ¶ 12. Plaintiff disputes the allegations of receiving complaints from other canvassers. Plaintiff's wife only once called a coworker and that was Sheryl Smith. Pla. SMF ¶ 15. On that occasion, Sheryl had asked Plaintiff if he could help her move by bringing his truck with him. Pla. SMF ¶ 15. Sheryl was asking that Plaintiff help her move on a Sunday. Pla. SMF ¶ 15. Sundays were the only days Plaintiff had to be with his family, so his wife called Sheryl to inform her that Plaintiff could not help her move on that day. Pla. SMF ¶ 15. Other than this one instance, Plaintiff's wife did not call any of Plaintiff's coworkers for any other reason. Pla. SMF ¶ 15.

Clearly, Plaintiff going to the Senator's office was the triggering event in Montenegro's decision to terminate him. The alleged complaints from other canvassers are pretext for Defendant's unlawful retaliation. Moreover, even if the "complaints" were true, it is unlikely that Plaintiff's wife calling one other canvasser would be sufficient on its own to terminate Plaintiff and warrant a specific meeting with the regional manager and assistant regional manager. Again, at best, these are all factual issues that must be resolved by a jury. In conclusion, there are genuine issues of material fact as to (1) whether Montenegro knew that Plaintiff had complained

about undocumented workers to the Senator's office; and (2) whether this knowledge motivated the decision to terminate Plaintiff's employment.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court **DENY** Defendants' Motion for Summary Judgment in its entirety.

Dated: April 19, 2017                     Respectfully submitted,

/s/ Rainier Regueiro
Anthony M. Georges-Pierre, Esq.
Florida Bar No. 533637
Rainier Regueiro, Esq.
Florida Bar No. 115578
**REMER & GEORGES-PIERRE, PLLC**
44 West Flagler St., Suite 2200
Miami, FL 33130
Telephone:  305-416-5000
Facsimile: 305-416-5005

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 19, 2017 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Jacob K. Auerbach, Esq.
Jacob@aalawllc.com
GALLUP AUERBACH
5521 N. University Drive, Ste 204
Coral Springs, FL 33067
Phone: (954) 894-3035

/s/ Rainier Regueiro
Anthony M. Georges-Pierre, Esq.
Florida Bar No. 533637
Rainier Regueiro, Esq.
Florida Bar No. 115578