UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

### Case Number: 17-20063-CIV-MORENO

NABOR DIEGO, and other similarly situated
individuals,

        Plaintiff,

vs.

VICTORY LAB, INC.,

        Defendant.

_____/

## ORDER DENYING DEFENDANT'S MOTION TO STRIKE AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

      This case is a two-count employment action by Nabor Diego against Victory Lab, Inc. arising from a six-week period of work between July 28 and September 8, 2016. Diego alleges: (1) wage and hour violations of the Fair Labor Standards Act, and (2) retaliation under Florida's Private Whistleblower Act. This cause comes before the Court upon Victory Lab's motion to strike portions of Diego's declaration testimony and Victory Lab's motion for summary judgment. Victory Lab argues that Diego was not an employee, and is therefore not entitled to the protections afforded by either statute. Additionally, it argues that the whistleblower claim fails because Diego did not engage in protected activity and, even if he did, Victory Lab was not aware of it before Diego was terminated. The Court has reviewed the motions, responses, and replies. Additionally, the parties raised some of their briefed arguments at oral argument on August 18, 2017. As explained below, Victory Lab's motion to strike is **DENIED**. Further, the Court finds that Diego was not an employee of Victory Lab under any applicable statute. Accordingly, Victory Lab's motion for summary judgment is **GRANTED**.

## I.   BACKGROUND

Victory Lab provides campaign services by engaging political canvassers to survey voters and hand out information regarding elections.  The canvassers knock on doors to identify supporters, persuade the undecided, and pass out pamphlets on particular candidates.  In 2016, Victory Lab contracted with the Florida Republican Senatorial Campaign Committee—a Political Action Committee—during the election campaign of former Senator Miguel Díaz de la Portilla and the re-election campaign of Senator Anitere Flores.  The contractual engagement was for 17 weeks, ending after the election on November 8.  Diego worked as a canvasser for Victory Lab from July 28 to September 8—approximately six weeks.  During this time, around 80 canvassers were working for Victory Lab.

There are no special skills, training, or experience required to be a canvasser.  Upon agreeing to be a canvasser, each individual received a packet which included the following:  (1) an independent contractor agreement; (2) a code of ethics; (3) a confidentiality agreement; (4) a dress code; and (5) a W-9 Form to report payments on a 1099 Form for tax purposes.  A canvasser's failure to agree to the various policies could result in termination and inclusion on Victory Lab's "do not hire" list.  However, Diego never signed and returned any of the documents.  When Diego was hired, he believed his last day of work would be Election Day, even though the Canvasser Questionnaire he completed during the hiring process included a reference to "future projects."

Graciela Montenegro served as a Victory Lab regional manager to oversee the canvassers and provide them with limited training,[1] technical assistance, and materials to distribute to the

---

[1] The record is unclear as to the extent Victory Lab provided training to canvassers.  Victory Lab contends that it does not instruct canvassers how to perform their duties, but also admits that the regional manager provides "limited training."  In his deposition, Diego stated that nobody trained him.  However, later, in his declaration, Diego stated that he was trained by a supervisor on his first day so that he would know how to perform his duties.

voters, such as door hangers, flyers, registration forms, name tags, notepads, pens, and paper. The Political Action Committee provided many of the materials and paid Victory Lab based on the number of doors the canvassers knocked on per week.

There was no set schedule for the canvassers; rather they were free to work as much or as little as they chose. Montenegro texted canvassers the location of the canvassing area each day, allowing each canvasser, including Diego, to decide whether he or she wanted to work that day. Canvassers responded by text if they wanted to work, but were not required to respond if they chose not to work on any given day. Canvassers that chose to work met Montenegro at a specified location, where she outlined that day's canvassing area that had been provided by the Political Action Committee. The canvassers then spent the day driving, knocking on doors, talking to voters, handing out pamphlets, and keeping detailed records of what occurred at each house, such as whether anyone answered the door, and the outcome of the solicitation attempt. Victory Lab used a GPS tracking system to monitor hours and work performed by each canvasser, requiring each canvasser to own either an iPhone or Android, and to download a software application which recorded the time, date, and location of each voter interaction. Canvassers received no benefits. They earned $15 per hour and later $16 per hour, but this increased to $19 per hour if driving other canvassers. Drivers were required to use their own vehicles and pay for their own gas. Diego sometimes served as the driver. During the time Diego worked for Victory Lab, he did not have time to work any other jobs, but did occasionally drive for Uber late at night.

Diego encountered a few problems during his brief time with Victory Lab. Female canvassers complained that Diego's wife called and texted them because she was jealous that Diego was canvassing with other women. Then, on August 19, Diego arrived late on a day he

was designated to drive, and another canvasser had been asked to drive in his place. Diego turned in his nametag, told Montenegro that he quit, and left for the day. However, after the August 19 incident, Diego and his wife texted Montenegro and asked if Diego could continue canvassing because they needed the money. Montenegro agreed to have Diego return to work on August 30. After Diego resumed canvassing, Montenegro again began receiving complaints from canvassers that Diego's wife was calling about Diego and his whereabouts.[2] Further, canvassers also complained that Diego acted inappropriately with several female canvassers.

Sometime between August 19 and August 30, Diego visited former Senator de la Portilla's office. Diego claims that he informed an office assistant that Victory Lab was hiring undocumented workers as canvassers, and that the assistant agreed to pass the message along to the former Senator. Diego describes his conversation as "civil." But, Montenegro testified that the former Senator's office called to tell her that Diego had visited and "began making a scene." There is no indication in the record that the former Senator's office ever told Montenegro or anybody else that Diego had accused Victory Lab of hiring undocumented workers.

On September 8, Montenegro and her assistant met with Diego at a Starbucks. They asked Diego whether he had contacted the former Senator's office, which Diego denied. Montenegro then terminated Diego's contract with Victory Lab because of: (1) his refusal to tell the truth; (2) his improper contact with the former Senator's office; and (3) other canvassers' complaints about his and his wife's behavior. Diego claims that it was clear to Montenegro during the termination meeting that he had reported Victory Lab's hiring of undocumented workers to the former Senator's office. However, Victory Lab claims that it only knew Diego had "caused a scene" at the office, with no other details. After Diego was fired, he threatened to:

---

[2] Although Diego disputes these calls, he provides no evidence to the contrary.

(1) report that Victory Lab was doing something illegal; (2) make the former Senator look bad by alleging that the campaign used illegal canvassers; (3) get Montenegro fired; and (4) go to the "labor department."

## II.     **LEGAL STANDARD**

Summary judgment is authorized where there is no genuine issue of material fact.  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The nonmoving party may not simply rest upon mere allegations or denials of the pleadings, but must establish the essential elements of its case on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The nonmovant must present more than a scintilla of evidence in support of its position.  A jury must be reasonably able to find for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).  In deciding a summary judgment motion, the Court must view the facts in the light most favorable to the nonmoving party. *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006).

## III.     **ANALYSIS**

### A.     **Motion to Strike**

Diego answered interrogatories on February 20, 2017 and was deposed on March 23.  On April 14, he submitted a sworn declaration in support of his opposition to Victory Lab's motion for summary judgment.  Victory Lab moves to strike portions of the declaration, arguing that some of Diego's statements are self-serving conclusions that contradict his earlier deposition and interrogatory testimony.  Diego argues that there is no actual conflict between the testimonies. The Court agrees with Diego.

Victory Lab objects to three statements in Diego's declaration.  First, Diego states, "[o]n the first day I sta[r]ted with defendant I was given training by [a] supervisor so that I would

know how to perform my duties as a canvasser." Victory Lab argues that this contradicts his

deposition testimony that states, "[m]any times when I first started to work there they never

taught me how to do my job." Victory Lab contends that Diego's later statement is an effort to

establish a disputed fact as to whether he was an employee or an independent contractor. But,

taken in context, these statements do not conflict. Diego's deposition statement relates only to

his knowledge of using the GPS tracking system. Diego may have been trained by a supervisor

on his first day, but not specifically as to the GPS system. Therefore, the two statements do not

necessarily conflict and any perceived inconsistency may be appropriately evaluated.

Second, Victory Lab challenges Diego's statements about his visit to the former

Senator's office, arguing that when Diego visited, he had already voluntarily quit and therefore,

his conduct could not be protected activity. It is unclear why Victory Lab makes this argument

in its motion to strike as it is a legal question addressed in the summary judgment briefs.

Third, Victory Lab argues that Diego's declaration attempts to show protected activity

where there was none. In Diego's declaration, he states, "I knew [that Victory Lab was using

undocumented workers] because one canvasser had asked me to cash her check for her because

she had no documentation." However, in a prior answer to an interrogatory, Diego responds:

> Interrogatory: Please describe how you know Defendant allegedly
> hired and employed many undocumented workers in violation of
> state and federal employment law.

> Answer: Andreina (LNU) asked me to cash a check for her.

Victory Lab argues that Diego embellished his declaration testimony to create a disputed fact,

and that anything Andreina said to Diego is inadmissible hearsay. Victory Lab's arguments are

misplaced. First, Diego's answer to the interrogatory and his declaration do not conflict. The

declaration is more descriptive than the interrogatory, but the substance is the same—that Diego

"knew" of Victory Lab's purported illegal hiring practices from his conversation with Andreina.

Further, Diego's conversation with Andreina is immaterial to the alleged protected conduct at issue—Diego's complaint to the former Senator's office about undocumented workers. The truth of Diego's alleged report to the Senator's office is not an issue before the Court. For the foregoing reasons, the Court denies Victory Lab's motion to strike any of the challenged portions of Diego's sworn declaration.

## B.   **Motion for Summary Judgment**

Victory Lab argues that it is entitled to summary judgment on both counts because Diego was never an employee under either statute. The Court agrees.[3] The question of whether an individual is an employee or an independent contractor is a legal question, with the subsidiary findings beings issues of fact. *Patel v. Wargo*, 803 F.2d 632, 634 n.1 (11th Cir. 1986). Thus, if there are disputed material facts supporting a reasonable conclusion that Diego was an employee, the Court must allow those disputed facts to be resolved by a jury. *See Olivas v. A Little Havana Check Cash, Inc.*, 324 Fed. App'x 839, 845 (11th Cir. 2009).

The protections of the Fair Labor Standards Act and Florida's Whistleblower Act apply only to "employees." *See* 29 U.S.C. §§ 206-07; Fla. Stat. § 448.102.[4] The term "employee," under either statute, does not include independent contractors. *See Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013) (Fair Labor Standards Act); *Morin v. Fla. Power &*

---

[3] Victory Lab makes two additional arguments for summary judgment on the whistleblower claim: (1) Diego did not engage in protected conduct because he did not complain directly to Victory Lab and was not working for Victory Lab at the time of the incident; and (2) Victory Lab was not aware of Diego's alleged protected conduct when Diego was fired. However, because the Court finds that Diego was not an employee, the Court need not address Victory Lab's alternative whistleblower arguments.

[4] The Fair Labor Standards Act defines "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). An "employer" "includes any person acting directly or indirectly in the interest of an employer in relation to an employee." § 203(d). The term "employ" "includes to suffer or permit to work." § 203 (g). The Whistleblower Act defines "employee" as "a person who performs services for and under the control and direction of an employer for wages or other remuneration. The term does not include an independent contractor." Fla. Stat. § 448.101(2).

*Light Co.*, 963 So.2d 258, 261 (Fla. Dist. Ct. App. 2007) (Whistleblower Act). Thus, independent contractors have no claim under either statute.

Whether an individual is an employee or an independent contractor under the Fair Labor Standards Act is determined by the "economic reality" of the relationship between the alleged employee and the alleged employer and whether that relationship demonstrates dependence. *Scantland*, 721 F.3d at 1311. "The inquiry is not governed by the 'label' put on the relationship by the parties or the contract controlling that relationship, but rather focuses on whether 'the work done, in its essence, follows the usual path of an employee.'" *Id.* (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947)); *see also McComb*, 331 U.S. at 729 ("[P]utting on an 'independent contractor' label does not take the worker from the protection of the Act."). Both Diego and Victory Lab rely on the following six factors, which many courts have used as guides in applying the economic reality test:

1) The nature and degree of the alleged employer's control as to the manner in which the work is to be performed;

2) The alleged employee's opportunity for profit or loss depending upon his managerial skill;

3) The alleged employee's investment in equipment or materials required for his task, or his employment of workers;

4) Whether the service rendered requires a special skill;

5) The degree of permanency and duration of the working relationship; and

6) The extent to which the service rendered is an integral part of the alleged employer's business.

*Scantland*, 721 F.3d at 1311.[5] These factors are not exhaustive, controlling, or dispositive; while they serve as guides, the overarching focus of the inquiry is economic dependence. *Id.*; *see also*

---

[5] Both parties in *Scantland* solely relied on these six factors. The Court is aware that the Eleventh Circuit has previously looked to eight similar factors to divine economic realities, but finds it unnecessary to outline each of

*Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311 (5th Cir. 1976) ("No one of these considerations can become the final determinant, nor can the collective answers to all of the inquiries produce a resolution which submerges consideration of the dominant factor—economic dependence.). "Ultimately, in considering economic dependence, the court focuses on whether an individual is 'in business for himself' or is 'dependent upon finding employment in the business of others.'" *Scantland*, 721 F.3d at 1312 (quoting *Mednick v. Albert Enters., Inc.*, 508 F.2d 297, 301-02 (5th Cir. 1975)).

Noting that these six factors[6] are not exclusive and that no single factor is dominant, this Court applies them here, viewing the facts relevant to each factor through the lens of "economic dependence" and whether it is more analogous to the "usual path" of an employee or an independent contractor. And because this case is at summary judgment, reasonable inferences are made in favor of Diego.

1.  ***First Factor:  Control***

The first factor considers the nature and degree of Victory Lab's control as to the manner in which the canvassing work is to be performed. Control arises when the purported employer goes beyond general instructions and begins to assign specific tasks, to assign specific workers,

---

those factors here. *See Freeman v. Key Largo Volunteer Fire & Rescue Dep't, Inc.*, 494 Fed. App'x 940, 943 (11th Cir. 2012).

[6] To determine whether an individual is an employee or independent contractor under the Whistleblower Act, Florida follows the ten-factor common law test outlined in Section 220 of the Restatement (Second) of Agency. *See Cantor v. Cochran*, 184 So.2d 173, 174-75 (Fla. 1966). The factors include:  (1) the extent of control which, by the agreement, the master may exercise over the details of the work; (2) whether or not the one employed is engaged in a distinct occupation or business; (3) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (4) the skill required in the particular occupation; (5) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (6) the length of time for which the person is employed; (7) the method of payment, whether by time or by the job; (8) whether or not the work is a part of the regular business of the employer; (9) whether or not the parties believe they are creating the relation of master and servant; and (10) whether the principal is or is not in business. Because the economic realities test for the Fair Labor Standards Act and the common law test for the Whistleblower Act are similar, the result under each test yields the same result. As such, the Court analyzes only the economic realities test here, as that test was accepted by the parties in their briefs.

or to take an overly active role in the oversight of the work. *Aimable v. Long & Scott Farms*, 20 F.3d 434, 441 (11th Cir. 1994).

Here, Victory Lab did not go beyond providing general instructions nor did it take an overly active role in oversight. Diego was never required to report to work on any given day. And when he chose to work, Victory Lab exerted only minimal control over his canvassing. For example, Victory Lab employed Montenegro to oversee canvassers, provide technical assistance, and give them materials. Canvassers met at a specific place and were assigned particular canvassing areas. They received limited training on their first day. Victory Lab used a GPS tracking system to monitor canvassers' hours and required them to download a mobile application to record the times, dates, and locations of each voter interaction. Further, Victory Lab required canvassers to adhere to a dress code with rules about facial hair and hygiene, and required them to wear a name badge and campaign t-shirt or sticker at times. Compensation was not negotiable, and canvassers could be disciplined for certain behavior.

Although all of these oversight actions show some degree of control, the nature of the oversight does not go beyond general instructions—Victory Lab was not overly active in overseeing the canvassing. Rather, it simply provided minimal guidance to support the work and collect data. This minimal oversight pales in comparison to Diego's freedom to decline canvassing work on any single day, even during such a short contract period.

Victory Lab also required Diego to agree to confidentiality, and prohibited him from working for other similar companies or for Victory Lab's clients for two years. However, the effect of these restrictions is softened because Diego never signed and returned any of the documents, including the independent contractor agreement, potentially supporting Diego's understanding that he was not required to comply with any of the restrictions.

-10-

These facts, even when viewed in the light most favorable to Diego, indicate that Victory Lab exerted only minimal control over the manner that Diego performed his work. In contrast, Diego was not required to work at all, and his absence had minimal effect on canvassing efforts. Thus, the first factor strongly favors independent contractor status.

2.    ***Second Factor: Opportunity for Profit or Loss***

The second factor considers Diego's opportunity for profit or loss depending upon his managerial skills. Diego's work did not require him to exert any managerial skill, especially not in a way that impacted his opportunity for profit or loss. Rather, Victory Lab provided a canvassing area for Diego to work for a negotiated hourly rate, which was decided when he was hired. Diego's ability to earn extra income through his own initiative was nonexistent. While Victory Lab was paid based on the number of doors canvassers knocked on, the canvassers themselves could not earn more by knocking on more doors—they were paid hourly regardless of their efficiency. These facts, taken in the light most favorable to Diego, indicate economic dependence much like a "usual employee." Thus, the second factor favors employee status.

3.    ***Third Factor: Investment in Equipment or Materials***

The third factor considers Diego's investment in equipment or materials required for his task, or his employment of workers. Victory Lab provided handout materials—i.e. door hangers and flyers—registration forms, name badges, notepads, pens, and paper. It also provided Montenegro with a monthly operating budget to buy other needed materials.

Although not required, Diego used his own vehicle to drive other canvassers and paid for his own gas. However, while an investment in a vehicle is substantial, this factor is diluted when the vehicle is one used largely for personal purposes rather than primarily for business. *See Molina v. S. Fla. Express Bankserv, Inc.*, 420 F. Supp. 2d 1276, 1285 (M.D. Fla. 2006). Further, Diego was paid more when he drove. Also, Victory Lab required Diego's phone to have

-11-

particular capabilities.  But, there is no evidence that Diego bought or used the phone exclusively, or even predominantly, for his canvassing job.  In sum, Diego's use of his car and phone required little need for independent capital.  And he received extra hourly pay when he did use his own car for the job.  These facts, taken in the light most favorable to Diego, indicate slight economic dependence.  Thus, the third factor only slightly favors employee status based on the novel materials provided by Victory Labs.  Because the materials provided were minimal, this factor is not afforded much weight in this particular case.

### 4.    *Fourth Factor: Special Skill*

The fourth factor considers whether the service rendered requires a special skill.  Here, Victory Lab concedes that no special skills were required to be a canvasser.  As no special skill set was needed, this factor indicates economic dependence much like a "usual employee."  Thus, the fourth factor favors employee status.

### 5.    *Fifth Factor: Permanency and Duration*

The fifth factor considers the degree of permanency and duration of the working relationship.  Here, all canvassers, including Diego, were retained by Victory Lab for less than four months to work for one election campaign.  Thus, Victory Lab argues that Diego could not have been economically dependent on Victory Lab's business as his primary employer.  *See Baker v. Flint Eng'g & Const. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998) ("[I]ndependent contractors often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas employees usually work for only one employer and such relationship is continuous in duration."); *Donovan v. Brandel*, 736 F.2d 1114, 1117 (6th Cir. 1984) (finding harvesters having only temporary relationship for 30-40 day harvest season do not have relationship of permanent nature even if they returned to harvest on other occasions). Indeed, Diego had a short, fixed employment period, and worked for only a few weeks before he

quit and was later terminated.  Further, Diego could choose to work as much or as little as he wanted as other work opportunities presented themselves.

Although Diego acknowledges that the nature of Victory Lab's business makes it somewhat impermanent, he also points to his own testimony that nobody told him that the job would end after Election Day, and that the job application for canvassers suggests that candidates are applying for current and future projects.  Even so, Diego unequivocally testified that he understood that his canvassing assignment would end after the election.  Thus, it is immaterial whether he was told the job would end or what the questions on the job application may implicate.  On balance, even assuming factual inferences in favor of Diego, and looking through the lens of economic dependence, the fifth factor strongly favors independent contractor status.

6.    ***Sixth Factor:  Integral Part of Alleged Employer's Business***

The sixth and final factor considers the extent to which the service rendered is an integral part of Victory Lab's business.  Here, canvassers make up almost all of Victory Lab's work. Victory Lab is in the canvassing business, and hired about 80 canvassers during this particular campaign.  Canvassing work is both routine and integral to Victory Lab's business.  A worker who performs a routine task that is a normal and integral phase of the alleged employer's production is likely to be dependent on the alleged employer's overall production process." *Antenor v. D & S Farms*, 88 F.3d 925, 937 (11th Cir. 1996).  Indeed, the more integral the service, the more likely the worker is an employee. *Scantland*, 721 F.3d at 1319.  Thus, the sixth factor favors employee status.

7.    ***Weighing the Factors***

Even when viewing the record in the light most favorable to Diego and drawing all reasonable inferences in his favor, the Court finds that he was economically independent from Victory Lab and therefore was an independent contractor.  Although four of the six factors favor

employee status, the two remaining factors strongly outweigh the others when analyzing economic dependence. Diego was hired for a 4-month job. And even during these four months, he was never required to report to work. The economic independence illustrated by these two facts alone outweighs the other facts pointing only to a minimal level of dependence. Of course, one can make an argument that every worker, including independent contractors, is at least partly economically dependent on others. But, the question is one of degree. And here, given the record, there is no genuine dispute of a material fact supporting a reasonable conclusion that Diego had such a degree of economic dependence that he was an employee of Victory Lab. Accordingly, the Court grants Victory Lab's motion for summary judgment.

## IV.   **CONCLUSION**

Based on the foregoing, it is

**ORDERED AND ADJUDGED** as follows:

- Victory Lab's Motion to Strike Declaration of Nabor Diego Filed in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment is **DENIED**; and

- Victory Lab's Motion for Summary Judgment is **GRANTED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 12th of October 2017.

FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record